UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                    Case No. 1:06:CR:273

LORD SHAWN RUSSELL,                               HON. GORDON J. QUIST

      Defendant.

——————————————————/

## OPINION

Defendant, Lord Shawn Russell, is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2), and several drug related crimes under 21 U.S.C. §§ 841 and 856 and 18 U.S.C. § 924. Defendant has moved to suppress firearms seized on June 10, 2006, and statements made by Defendant on that date prior to being advised of his *Miranda* rights.[1] For the following reasons, the Court will deny Defendant's motion to suppress.

## Findings of Fact

On June 10, 2006, at around11:30 p.m., the Kent County Sheriff's Department responded to a 911 call of a gunshot at the Franklin Mill Apartments in Grand Rapids, Michigan. When officers arrived, they found Defendant in the parking lot. Officers placed Defendant on the ground, patted him down for weapons and then let him up. The officers then interviewed Defendant, who reported

---

[1] Defendant's motion also sought the suppression of cell phone records related to the seizure of cell phones on June 10, 2006, and cocaine and heroin seized on June 8, 2005. However, the government indicated at the hearing that it is no longer using the cell phone records as evidence, and the government has filed a second superseding indictment which does not include any charges arising from the drug evidence from June 8, 2005. Therefore, Defendant's motion to suppress the cell phone records and drugs is moot.

that five unknown men had tried to rob him in his apartment.  Defendant said that the five men had run to the back of the apartment building.  The officers, at this point, treated Defendant as a victim of the crime.  They searched for the people who had allegedly held up Defendant.

Officers asked Defendant if they could go into his apartment, and Defendant consented. Defendant's apartment was in disarray.  Deputy Rob Porter questioned three or four other residents of the apartment complex, some of whom were observing what was going on, and was informed by the residents that Defendant would go to the trunk of a white Lincoln at all hours of the day and night to get something for people who would be in his apartment for short periods of time.  The residents told Deputy Porter that Defendant was probably dealing drugs from the Lincoln.  About this time, Defendant was patted down again and over $11,000 in cash was removed from Defendant's pocket.

At this point, the officers' suspicions started to focus on Defendant as a potential drug dealer. The officers took Defendant to a squad car and let him sit there without handcuffs.  They let Defendant make cell phone calls and go back into his apartment to get a sweatshirt.  At the suggestion of Deputy Porter, the Grand Rapids Police Department was called for technical assistance to try to find firearms that may have been involved in the shooting, and the Sheriff's drug unit was called.

Sgt. John Wu of the Grand Rapids Police Department came to the scene with his well qualified K-9 dog, Dino.  Dino located a loaded semi-automatic handgun buried near a tree near the apartment complex where the alleged hold-up perpetrators were reported by Defendant to have run. Dino also alerted on the white Lincoln which was described by the apartment residents as the vehicle from which Defendant was dealing drugs.  Sgt. Wu did not stay for the search of the vehicle, which was impounded and in which two firearms were found in the trunk, but no drugs were found.

Det. Bruce Ivie, a drug investigator, arrived.  He was briefed by Deputy Porter as to the cash and the suspicions of the people in the apartment complex.  He knew that Defendant had a history of drug dealing.  He was informed of the drug alert.  He placed Defendant under arrest and read Defendant his Miranda rights.  Defendant voluntarily talked to Det. Ivie.  Defendant said that he had been in his apartment and was accosted by five armed men inside and outside of his apartment, who got away and who fled in a yellow vehicle.  Det. Ivie suspected a "drug rip" – a hold-up of a drug dealer.  Defendant told Det. Ivie that he had $17,000 or $20,000 on him, and that he gained this money by gambling and selling cars.  He had no employment.  Defendant told Det. Ivie that the white Lincoln was not his; it belonged to a "white dude named Kenny."  When asked why the keys to the Lincoln were in his apartment, Defendant said that he had lots of keys in his apartment.  Defendant claimed that the only car that was his was a red and white Blazer parked next to the Lincoln.   The Blazer was not registered to the Defendant.

## Conclusions of Law

I.      **Search of the Lincoln**

   A.      **Standing**

Defendant bears the burden of proof to show that he has standing to challenge the search. *Rakas v. Illinois,* 439 U.S. 128, 130 n.1, 99 S. Ct. 421, 424 n.1 (1978).   There is a two part test that a defendant must pass in order to show standing: 1) he must show that he had a reasonable expectation of privacy in the searched premises, and 2) he must show that society is prepared to recognize that expectation.  *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998).

The Sixth Circuit has held that a defendant lacks standing to challenge a search of items, such as briefcases and backpacks, whose ownership the defendant has disclaimed. *See United States v.*

*Tolbert*, 692 F.2d 1041, 1044-45 (6th Cir. 1982); *United States v. Peters*, 194 F.3d 692, 695-96 (6th Cir. 1999).  In one case, the appeals court mentioned that a defendant who denied knowledge of a vehicle and its contents lacked standing to challenge a search of the vehicle.  *See Brubaker v. United States*, 183 F.2d 894, 897 (6th Cir. 1950) ("Brubaker denied all knowledge of the car and the ownership of its contents. Constitutional immunity from unreasonable search and seizure is personal and may not be availed of by one who denies ownership or possession.").

In this case, Defendant told police that the Lincoln belonged to someone named Kenny, even though the keys to the vehicle were found in Defendant's apartment.  Defendant also told police that the only vehicle he owned was the Blazer parked in the lot.  Defendant does not contest that he disavowed ownership of the Lincoln.  Because Defendant disclaimed ownership of the Lincoln, denied knowledge of having the Lincoln's keys in his apartment, and stated that another individual owned the vehicle, he lacks standing to challenge the search of the vehicle.

### B.    Probable Cause

Even if Defendant had standing to challenge the search of the Lincoln, the search was supported by probable cause.  Defendant argues that a warrantless search of the Lincoln was illegal because the vehicle was not "readily mobile."  Defendant argues that he was in custody, the car was parked in his apartment complex's parking lot, and the keys to the vehicle were seized, so that there was no danger of the car being moved.

However, as the Supreme Court has discussed, "although ready mobility alone was perhaps the original justification for the vehicle exception, our later cases have made clear that ready mobility is not the only basis for the exception." *California v. Carney*, 471 U.S. 386, 391, 105 S. Ct. 2066, 2069 (1985).  "Even in cases where an automobile was not immediately mobile, the lesser

4

expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Id*. "[E]ven when enclosed 'repository' areas have been involved, we have concluded that the lesser expectations of privacy warrant application of the exception." *Id*. (noting the application of the vehicle exception "in the context of a locked car trunk" in *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523 (1973)). Therefore, the question of whether the Lincoln was readily mobile is not dispositive regarding the constitutionality of the warrantless search of the vehicle.

Probable cause to search the Lincoln was established by the statements of witnesses that the car was likely used for drug dealing, the amount of cash found on Defendant, the Defendant's attempt to disassociate himself from the Lincoln, and the K-9 unit's alert for narcotics in the Lincoln. A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance. *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) (citing *United States v. Knox*, 839 F.2d 285, 294 n. 4 (6th Cir.1988)). "For a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established." *Id*. at 394. The K-9 unit here was certified and well qualified with years of experience.

Furthermore, the fact that the Lincoln was searched after it was impounded does not render the search illegal. "If police officers have probable cause, they may conduct a warrantless search of the vehicle, 'even after it has been impounded and is in police custody.'" *United States v. Kincaide*, 145 F.3d 771, 779 (6th Cir. 1998) (quoting *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S. Ct. 3079, 3080 (1982)). The Supreme Court in *Thomas* stated:

> It is thus clear that the justification to conduct such a warrantless search does not
> vanish once the car has been immobilized; nor does it depend upon a reviewing
> court's assessment of the likelihood in each particular case that the car would have

been driven away, or that its contents would have been tampered with, during the
period required for the police to obtain a warrant.

*Thomas*, 458 U.S. at 261, 102 S.Ct. at 3080-81.

Based on the circumstances and the K-9 unit's alert to the odor of drugs in the Lincoln, the

officers had probable cause to search the Lincoln, and that search was valid even after the vehicle

was impounded. While there is a question about whether the K-9 alerted to the front passenger

compartment or the rear passenger compartment near the trunk, a K-9 unit's alert to the passenger

compartment of a vehicle establishes probable cause to search the trunk of that vehicle. *See United

States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004) (holding that "a canine alert toward the

passenger area of a vehicle gives rise to probable cause to search the trunk as well"); *United States

v. Watson*, 783 F.Supp. 258, 265 (E.D. Va. 1992) (finding that a dog's alert to the passenger seat of

a lawfully stopped vehicle justified a search of the vehicle's trunk, citing *United States v. Ross*, 456

U.S. 798, 102 S. Ct. 2157 (1982), for the proposition that if probable cause exists to search a

lawfully stopped vehicle, it justifies a search of every part of the vehicle that may conceal the object

of the search).

## II.      Statements Made to Officers

Defendant argues that he was in custody and interviewed by several officers prior to being

read his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1996). "In

determining whether a defendant was subject to custodial interrogation [courts] look to the totality

of the circumstances 'to determine how a reasonable man in the suspect's position would have

understood the situation.'" *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003) (quoting

*United States v. Salvo*, 133 F.3d 942, 948 (6th Cir. 1998)) (internal quotation marks omitted). "The

'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of

the degree associated with a formal arrest.'" *Id*. at 529 (quoting *United States v. Knox*, 839 F.2d 285, 291 (6th Cir.1988)) (internal quotation marks omitted).  "[I]nterrogation 'extend[s] only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.'" *United States v. Ortkiese*, 208 F.App'x 436, 440 (6th Cir. 2006) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 302,  100 S. Ct. 1682, 1690 (1980)).

Defendant was initially detained because officers were investigating a report of a shot being fired.  Following the initial questioning of Defendant, the officers reasonably believed Defendant to be a possible victim of a crime based on  Defendant's voluntarily statement that five men broke into his apartment and attempted to rob him, and the fact that Defendant's apartment was in disarray. The officers questioned Defendant about the alleged  robbers, asked Defendant whether he had a gun, and obtained consent to look in his apartment.  In addition to whether or not a defendant is free to leave, which Defendant here was not, other factors to be considered in determining whether the questioning was a custodial interrogation are:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police ... [or] acquiesced to their requests to answer some questions.

*Swanson*, 341 F.3d at 529 (quoting *Salvo*, 133 F.3d at 950).

 The officers in this case encountered a situation where a shot had been fired and the risk of danger required that they question Defendant.  A "warrantless interrogation is permitted when officers have a reasonable belief based on articulable facts that they are in danger." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001).  Defendant stated that he did not have a gun, that he was

the victim of an attempted robbery, and that the robbers ran to the back of the apartment complex. Defendant willfully made the statements without coercion in an attempt to advance his own interests and exculpate himself. Defendant made the statements while he was out in the open and not handcuffed. While placed in the patrol car, without handcuffs, Defendant was allowed to make cell phone calls and to re-enter his apartment to retrieve clothing. Therefore, Defendant was not subject to a custodial interrogation when he made his statements to the officers regarding the incident prior to being placed under arrest when handcuffed and advised of his *Miranda* rights by Detective Ivie.

### Conclusion

For the reasons set forth above, the Court will deny Defendant's motion to suppress.

An Order consistent with this Opinion will be entered.


Dated:  June 13, 2007                              _____/s/ Gordon J. Quist_____
                                                                     GORDON J. QUIST
                                                                     UNITED STATES DISTRICT JUDGE